J-A16017-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.R., SR., FATHER | : | No. 40 MDA 2020 |

Appeal from the Decree Entered December 10, 2019
In the Court of Common Pleas of Columbia County
Orphans' Court at No: 2019-OC-225-RT

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.R., SR., FATHER | : | No. 41 MDA 2020 |

Appeal from the Decree Entered December 10, 2019
In the Court of Common Pleas of Columbia County
Orphans' Court at No: 2019-OC-226-RT

| | | |
|---|---|---|
| IN RE: Z.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.R., SR., FATHER | : | No. 42 MDA 2020 |

Appeal from the Decree Entered December 10, 2019
In the Court of Common Pleas of Columbia County
Orphans' Court at No: 2019-OC-227-RT

J-A16017-20

BEFORE:   PANELLA, P.J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY STABILE, J.:                    **FILED AUGUST 03, 2020**

A.R., Sr. ("Father"), appeals from the decrees entered on December 10, 2019, which terminated involuntarily his parental rights to his children, Z.R. 1, a male born in October 2014; Z.R. 2, a female born in June 2016; and Z.R. 3, a male born in August 2017 (collectively, "the Children").[1]  After careful review, we affirm in part, vacate in part, and remand for further proceedings consistent with this memorandum.

The record reveals that Columbia County Children and Youth Services ("CYS") became involved with Father in approximately 2013, due to concerns regarding his two children from a prior relationship.[2]  N.T., 12/9/19, at 139-40.  CYS became involved with Father, Mother, and Z.R. 1 the following year. According to the family's Service Plan, CYS received reports in December 2014 that Father and Mother were living in poor home conditions, and that there were issues regarding their parenting of Z.R. 1.  Exhibit CYS-1 (3/2/15 Service Plan for Z.R. 1) at B-1.  It appears that CYS did not file a dependency petition at that time and that Z.R. 1 remained in the home.  Subsequently, in February 2018, CYS implemented a safety plan with the family, due to Mother's alleged

---

[1] The decrees also terminated involuntarily the parental rights of the Children's mother, A.R. ("Mother").  Mother appealed the termination of her rights at Superior Court docket numbers 47, 48, and 49 MDA 2020.  We address her appeal in a separate memorandum.

[2] Father testified that his two older children are currently in the custody of their mother and that he is in the process of seeking partial physical custody. N.T., 12/9/19, at 139, 150.

- 2 -

substance abuse and erratic behaviors. Exhibit CYS-2 (4/30/18 Permanency Plan for Z.R. 3) at A-1. CYS filed dependency petitions in March 2018, alleging that both Father and Mother were engaging in substance abuse. *Id.* On April 9, 2018, CYS received a report that Father overdosed in the family's home. *Id.* Father claimed that it was not he but one of Mother's relatives who had overdosed. *Id.* However, when CYS conducted a drug screen of Father, he tested positive for both amphetamines and methamphetamines. *Id.* at A-2. CYS requested and received emergency protective custody of the Children that same day. *Id.* The juvenile court conducted a shelter care hearing on April 13, 2018, and adjudicated the Children dependent on April 27, 2018. *Id.* at E-1.

As detailed below, Father failed to address his substance abuse history and lacked stable housing throughout the Children's dependency. On October 1, 2019, CYS filed petitions to terminate Father's parental rights involuntarily. The orphans' court held a hearing on December 9, 2019, at the conclusion of which it announced that it would terminate Father's rights. The court entered decrees memorializing this decision the following day. Father timely filed notices of appeal on January 3, 2020, along with concise statements of errors complained of on appeal.

Father now raises the following claims for our review:

1. Did the [orphans'] court commit[] an error of law and abuse of discretion when it terminated the parental rights of [F]ather . . . to [the C]hildren?

2. Did the [orphans'] court commit[] an error of law and abuse of discretion when it determined that [CYS] presented clear and convincing evidence in support of terminating the parental rights of [Father]?

3. Did the [orphans'] court commit[] an error of law and abuse of discretion when it determined that the conditions that [led] to the removal of the [C]hildren continue to exist and termination of parental rights would best serve the needs and welfare of the [C]hildren, where Father was working on completing the objectives for reunification?

4. Did the [orphans'] court commit[] an error of law and abuse of discretion in determining the best interest of the [C]hildren would be served by terminating the parental rights of Father?

Father's Brief at 7-8 (suggested answers omitted).

Father's claims are interrelated, so we will address them together. Our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S.A. § 2511. It requires a bifurcated analysis:

. . . . Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate pursuant to Section 2511(a)(2) and (b), which provides as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*\*\*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

***

23 Pa.C.S.A. § 2511(a)(2), (b).

We first consider whether the orphans' court abused its discretion by terminating Father's rights pursuant to Section 2511(a)(2). Our analysis is as follows:

. . . . In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Father contends on appeal that CYS failed to present sufficient evidence in support of its petition to terminate his parental rights involuntarily. Father argues that he made efforts toward achieving reunification with the Children by maintaining employment and stable housing, obtaining mental health and substance abuse evaluations, attending mental health and substance abuse treatment, completing parenting classes, and attending visits. Father's Brief at 14-20. He also complains that CYS did not do enough to help him achieve reunification, emphasizing that the caseworker never visited the home where he currently resides, never inquired as to whether he obtained a mental health evaluation, and knew little if anything about his progress in parenting classes. *Id.* at 14-17.

The orphans' court explained its decision to terminate Father's parental rights pursuant to Section 2511(a) as follows:

> This is the type of case that is sadly becoming more and more common. It involves parents in the throes of addiction who are trying to become stable and clean from drugs and be re-established in the community. Mother and Father both appear to be decent people. Without the scourge of drugs, they would have been fine parents. Both of these parents have made efforts to comply with the Family Service Plan and to be in a position to support, nurture, and provide proper security for these children. However, their efforts have been wholly inadequate.
>
> ***
>
> Father has commendably been making efforts to address his drug issues. Remarkably, foster care began when he overdosed on drugs but survived. He has visited the [C]hildren and has been employed and is addressing his drug issues. But . . . his efforts have been to take care of himself (which is what he should be

doing and needs to do) and to visit the [C]hildren. In the meantime the [C]hildren need stability. Father has two other children for whom he is seeking partial custody. Father has many obligations which he is admirably attempting to handle. However, there is no reasonable probability that he can provide adequate parenting and stability and nurture to these three children in the foreseeable future.

Orphans' Court Opinion, 2/25/20, at 8-9.

Our review of the certified record supports the decision of the orphans' court. Most significantly, CYS caseworker Brittany Hacker testified regarding Father's failure to address his history of substance abuse. Ms. Hacker reported that Father attended an intake appointment for substance abuse treatment in July 2018 and received a recommendation for intensive outpatient treatment. N.T., 12/9/19, at 36. Father subsequently failed to attend intensive outpatient treatment appointments consistently, if at all. *Id.* at 36-39. He rescheduled appointments, failed to attend, and then rescheduled again. *Id.* at 36-37. In September 2018, Father reported that he had attended an intake appointment for medication-assisted treatment due to a recent relapse and that he received a prescription for Suboxone. *Id.* at 37. However, by October 2018, he was no longer attending medication-assisted treatment. *Id.* Father claimed that he was simply too busy to attend treatment because of working and starting school. *Id.* at 37-38. He also claimed that he was still rescheduling intensive outpatient treatment appointments but, to Ms. Hacker's knowledge, he never attended any of them. *Id.* at 38-39. Father seemingly made no further efforts to obtain treatment until completing a self-reported assessment in September 2019, which indicated that he met the criteria for outpatient treatment. *Id.*

at 40. Father maintained that he scheduled an intake appointment to obtain outpatient treatment, but Ms. Hacker was unable to confirm that he actually attended, possibly because he failed to sign a release. *Id.* at 40-41.

Father's own testimony confirmed that his history of substance abuse remained unaddressed. Regarding his medication-assisted treatment, Father explained that he stopped taking the Suboxone prescription because it was making him sick. *Id.* at 144. Strikingly, Father admitted that the reason the Suboxone was making him sick was that he was attempting to use both it and illegal drugs at the same time. *Id.* at 151. He acknowledged that he "didn't really start or do any type of drug treatment" until July 2019, and that he was under the influence of substances as recently as September 2019. *Id.* at 151-52. Father recalled that he attended a court hearing that month and that "my parole officer knew I was high when I came into the [c]ourthouse."[3] *Id.* at 152. He testified that he was only now addressing his substance abuse history by attending Alcoholics Anonymous meetings and scheduling substance abuse counseling. *Id.* at 143-44. Father claimed that he would be attending his first counseling appointment the day after the termination hearing, noting that it was mandatory for his parole. *Id.* at 143, 148.

---

[3] CYS presented Father's criminal docket sheets, which indicated that he pled guilty to drug possession in July 2019 and had a pending drug paraphernalia charge. N.T., 12/9/19, at 50-51; Exhibits CYS-13 and 14. Father testified that he also pled guilty to the paraphernalia charge and that he had no pending charges, although he remained on parole. N.T., 12/9/19, at 147-48.

In addition, the record demonstrates that Father lacked stable housing throughout the Children's dependency. Ms. Hacker testified that Father and Mother were evicted from their initial housing in April or May 2018, and that they began living in a hotel and in their car. *Id.* at 32-33. They then lived with family members in June or July 2018. *Id.* at 33. Father and Mother apparently ended their relationship, and Father reported in October 2018 that he was living with his employer. *Id.* at 34, 46. However, Father and Mother were back together and moving into a trailer by January 2019. *Id.* at 34. Ms. Hacker explained that Mother was incarcerated the following month, but that Father remained at the trailer until June 2019, when he indicated that he was living with his uncle. *Id.* at 28, 47. By July 2019, Father was living with his mother. *Id.* Ms. Hacker discovered in September 2019 that Father had been incarcerated. *Id.* Father reported in November 2019 that he was released from incarceration and was again living with his mother.[4] *Id.* at 48.

In light of this evidence, it is clear that Father is incapable of parenting the Children, and that he cannot or will not remedy his parental incapacity. The Children entered foster care in April 2018. By the time of the termination hearing in December 2019, they had remained in foster care for over a year and a half. During the Children's placement, Father made little if any progress toward addressing his history of substance abuse, obtaining stable housing, and otherwise placing himself in the position to provide them with appropriate

---

[4] Father testified that he was also incarcerated for two weeks in July 2019. N.T., 12/9/19, at 137-38.

- 10 -

parental care. Most significantly, Father continued to abuse substances as recently as September 2019, only three months prior to the hearing. The Children's lives cannot remain on hold indefinitely when Father has shown almost no prospect of improvement. *See In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006) ("[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."). Therefore, we affirm the decision of the orphans' court to terminate Father's parental rights pursuant to Section 2511(a)(2).[5]

We next consider Father's fourth issue, in which he contends that the orphans' court committed an error of law or abuse of discretion by terminating his parental rights to the Children pursuant to Section 2511(b). The requisite analysis is as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

---

[5] Regarding Father's argument that CYS did not do enough to help him achieve reunification, our Supreme Court has held that reasonable reunification efforts are not a prerequisite for the termination of parental rights pursuant to Section 2511(a)(2). *See In re D.C.D.*, 105 A.3d 662 (Pa. 2014).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted).

Father contends that CYS presented insufficient evidence regarding the Children's needs and welfare. Father asserts that he maintained a relationship with the Children by attending visits, that he acted appropriately during visits, and that there was no testimony that the Children exhibited any behavioral problems after visits. Father's Brief at 16, 19, 20-21. He emphasizes Ms. Hacker's testimony that that the Children share a bond with both him and the foster family, and complains that CYS failed to present testimony, expert or otherwise, regarding the impact that terminating his rights would have on the Children. *Id.*

The orphans' court explained its decision to terminate Father's parental rights pursuant to Section 2511(b) as follows:

> These children are at a tipping point in their lives. The major consideration in this case is their best interest. This court is unwilling to gamble that miraculously these parents will be in a position to provide a home and adequate support and nurture for these children in the foreseeable future. To uproot them from a

stable environment in their formative years is an unwise gamble with precious lives. To postpone a decision while the parents have no plans to establish a nurturing, supportive home for the [C]hildren is equally unwise. After almost two years of placement and five years of concerns and supervision by [CYS], the odds of a stable home for these children with Mother and Father are slim.

\*\*\*

. . . . Not only have Father and Mother failed to perform parental duties for the [C]hildren since April 9, 2018, there is no indication that they will be able to do so in the near future. It is not in the best interest of the [C]hildren to deny them permanency, stability, comfort, and hope. These children are now thriving and need continued stability and permanency.

Orphans' Court Opinion, 2/25/20, at 9-12.[6]

_____

[6] The orphans' court conducted an *in camera* interview of Z.R. 1 during the termination hearing. Z.R. 1 stated that he wanted to stay at his foster home. N.T., 12/9/19, at 21-23. However, the court found that Z.R. 1 "certainly didn't have the maturity to reasonably articulate what he wanted to do or not do and reasons for it and all that sort of thing. He just seems to be kind of content with life, from what I could see." *Id.* at 25. The court agreed with the opinion of the Children's guardian *ad litem*, who asserted that Z.R. 1 and his siblings were unable to offer their positions on the termination of Father's rights. *Id.* at 3-4, 25. At the conclusion of the hearing, the court stated the following regarding the interview:

In the meantime, we talk about poor [Z.R. 1] back there, and he's a nice young man who couldn't express his opinion about a whole lot of things except I got this out of him . . . that he was happy and comfortable where he was. I mean, he didn't say anything negative about his parents or anything, but he was happy and comfortable where he was. . . .

And I suspect the other children are probably similar but maybe not on his level, but they all have great possibilities of having a happy life ahead of them, a productive life ahead of them, and they're doing pretty well and cared for [*sic*] right now. I hate to be the one that rolls the dice and say[s], well, let's put

While it was appropriate for the orphans' court to consider the Children's need for stability and permanency, and while the record supports the court's findings in this regard, we are constrained to conclude that the court's analysis was incomplete. As explained above, a court may not terminate parental rights pursuant to Section 2511(b) without considering whether an emotional bond exists between the relevant parent and child, and what harm, if any, will befall the child if the court severs that bond. **See C.D.R.**, 111 A.3d at 1219; **see also In re Adoption of J.N.M.**, 177 A.3d 937, 944 (Pa. Super. 2018), *appeal denied*, 183 A.3d 979 (Pa. 2018) (quoting **In re E.M.**, 620 A.2d 481, 484-85 (Pa. 1993)) ("When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'").

In the matter at bar, CYS presented a dearth of evidence addressing the Children's relationship with Father. As Father argues in his brief, Ms. Hacker testified that the Children share a bond with both him and their foster parents. N.T., 12/9/19, at 60-62, 80. Regarding the Children's bond with Father, she explained, "Father's typically appropriate with the [C]hildren. He would bring them lunch, play with them. . . . They would hug him and say dad or ask him for help, but they also will play independently sometimes. So sometimes they

---

them on hold for awhile [*sic*] and then do more damage 'cause there's been damage done already . . . .

**Id.** at 166.

would just be off doing their own thing." *Id.* at 80. Ms. Hacker did not opine that the Children's bond with Father was not a necessary and beneficial bond, that severing that bond would not harm the Children, or anything similar.

Moreover, the orphans' court failed to address the Children's bond with Father before deciding to terminate his parental rights. The court's opinion makes no mention of the bond or of the effect that severing it would have on the Children. Because this was legal error, we must vacate the portion of the court's decrees terminating Father's rights as to Section 2511(b) and remand for further proceedings. *See E.M.*, 620 A.2d at 485 (remanding "for a reevaluation of the needs and welfare of the children, taking into account whatever bonds may currently exist between the children and appellant, as well as other factors having bearing upon whether termination is proper."); *see also In re Adoption of A.C.H.*, 803 A.2d 224, 230 (Pa. Super. 2002) (remanding "to give the parties an opportunity to present further testimony regarding the emotional bonds between mother and daughter, and the effect a termination of parental rights would have on A.C.H.").

Based on the foregoing analysis, we affirm the portion of the December 10, 2019 decrees terminating Father's parental rights to the Children pursuant to Section 2511(a) but vacate the portion of the decrees terminating pursuant to Section 2511(b) and remand. On remand, the orphans' court must conduct an additional hearing as soon as possible, in order to receive and consider evidence regarding the Children's bond with Father, after which it must enter new decrees granting or denying termination pursuant to Section 2511(b).

- 15 -

Decrees affirmed in part and vacated in part. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/3/2020